**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| ERMA ALDABA, PERSONAL REPRESENTATIVE AND NEXT OF KIN TO JOHNNY MANUEL LEIJA, DECEASED, | ) ) ) ) ) |
| PLAINTIFF, | ) ) |
| vs. | ) Case No. CIV-12-85-FHS ) |
| THE BOARD OF MARSHALL COUNTY COMMISSIONERS; et al, | ) ) ) |
| DEFENDANTS. | ) |

**DEFENDANT BOARD OF MARSHALL COUNTY COMMISSIONERS' MOTION FOR
SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Respectfully Submitted,

s/ Philip W. Anderson
Chris J. Collins, OBA No. 1800
Philip W. Anderson, OBA No. 16402
COLLINS, ZORN & WAGNER, P.C.
429 NE 50th, Second Floor
Oklahoma City, Oklahoma 73105
Telephone:     (405) 524-2070
Facsimile:     (405) 524-2078
Email: cjc@czwglaw.com
                panderson@czwglaw.com
Attorneys for Defendant Board of County
Commissioners of Marshall County

December 18, 2012

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iii

LIST OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF MATERIAL FACTS TO
WHICH THERE IS NO GENUINE ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT AND AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.    1983 CLAIM AGAINST THE BOARD OF
           COUNTY COMMISSIONERS OF MARSHALL COUNTY . . . . . . . . . . . . . . 10

      B.    TORT CLAIM AGAINST BOARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITY

**CASES**                                                                                          **PAGE**

*Adler v. Wal-Mart Stores, Inc.,* 144 F. 3d 664 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Allen v. B'd of Commissioners of Pittsburg County*, 1911 OK 130, ¶ 2 116 P. 175 . . . . . . . . . . 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10

*Clark v. City of Draper*, 168 F. 3d 1185, 1187 n.5 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 11

*Conaway v. Smith*, 853 F. 2d 789 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Cone v. Longmont United Hosp. Ass'n*, 14 F. 3d 526 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . 10

*Full v. Odom*, 1987 OK 64, ¶ ¶ 3-4, 741 P. 2d 449 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Graham v. Keuchel*, 1993 OK 6, 847 P.2d 343, 348 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hall v. Bellmon*, 935 F. 2d 1106 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Jantzen v. Board of County Commissioners of Canadian County,*
       188 F. 3d 1247 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kuruzhkov v. State*, 2006 OK CIV APP 114, 144 P. 3d 186, 192 . . . . . . . . . . . . . . . . . . . . . . . . 13

*Latimore v. Board of County Commissioners of Okmulgee County*,
       1948 OK 163, 195 P. 2d 762, 764 (quoting *In re Assessment of*
       *First Nat. Bank of El Reno,* 1917 OK 392, 166 P. 883, 884) . . . . . . . . . . . . . . . . . . . . . . 11

*Lockhart v. Loosen*, 1997 OK 103, 943 P. 2d 1047, 1079 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Meade v. Grubbs*, 841 F. 2d 1512 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Monell v. Dept. of Social Services of City of New York*,
       436 U.S. 658, 694, 98 S. Ct. 2018, L. Ed. 2d 611 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Salazar v. City of Oklahoma City*, 1999 OK 20, 976 P. 2d 1053, 1067 . . . . . . . . . . . . . . . . . . . . 13

*Schmidt v. Grady County*, 1997 OK 92, 943 P. 2d 59512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Stroud v. Arthur Anderson & Co.*, 2001 OK 76, 37 P. 3d 783, 791 . . . . . . . . . . . . . . . . . . . . . . . 14

## RULES

Rule 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## STATUTES

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,12

Okla. Stat. tit. 19, § 131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Okla. Stat. tit. 19, § 339 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Okla. Stat. tit. 19, § 547 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Okla. Stat. tit. 51, § 152.1(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Okla. Stat. tit 51, § 152.1(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Okla. Stat. tit. 51, § 153(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Okla. Stat. tit. 51, § 155 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Okla. Stat. tit. 51, § 155(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13,14

**LIST OF EXHIBITS**

Exhibit 1:       Excerpts from the deposition of Olivia Arrellano

Exhibit 2:       Excerpts from the deposition of Melissa Farmer

Exhibit 3:       Excerpts from the deposition of John Conley

Exhibit 4:       Excerpts from the deposition of Matt Turvey

Exhibit 5:       Excerpts from the deposition of James Atnip

Exhibit 6:       Excerpts from the deposition of Steve Beebe

Exhibit 7:       Excerpts from the deposition of Marc Harrison

Exhibit 8:       Excerpts from the deposition of Robert Wilder

Exhibit 9:       CLEET Training Course Roster Documents

Exhibit 10:     Excerpts from the Marshall County Sheriff's Operations Manual

Exhibit 11:     Deputy Beebe's CLEET Records

Exhibit 12:     Deputy Atnip's CLEET Records

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

ERMA ALDABA, PERSONAL )
REPRESENTATIVE AND NEXT )
OF KIN TO JOHNNY MANUEL )
LEIJA, DECEASED, )
                   )
          PLAINTIFF, )
                   )
vs. )  Case No. CIV-12-85-FHS
                   )
THE BOARD OF MARSHALL )
COUNTY COMMISSIONERS, et al. )
                   )
         DEFENDANTS. )

## DEFENDANT BOARD OF MARSHALL COUNTY COMMISSIONERS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Defendant Board of Marshall County Commissioners ("Board"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves for summary judgment in its favor for the reasons set forth herein.

## STATEMENT OF MATERIAL FACTS TO WHICH THERE IS NO GENUINE ISSUE

1.    On March 19, 2011, between 5:00 a.m. and 6:00 a.m., Johnny Leija's (Leija) chest began hurting, and he started gasping for breath. (Ex. "1," Deposition of Olivia Arellano, p. 60:16-60:22).

2.    Around noon on March 19, 2011, Leija went to Texoma Medical Center in Madill, OK, where he was told he was suffering from gastritis as a result of the hot sauce he had eaten the night before, and was told to take Prilosec.  (Ex. 1, p. 63:14-65:25)

3.    After taking several doses of Prilosec, Leija was still not feeling better on March 21, 2011, so he went to Mercy Medical Center in Ardmore, OK. Leija was diagnosed as possibly

suffering from muscle spasms, and put on two muscle relaxers and Motrin 600. (Ex. 1, p. 69:13-72:19).

4.        On March 22, 2011, around 2:00 or 3:00 p.m., Leija began taking the muscle relaxers and Motrin 600.  He also took prescription Robitussin that had been prescribed to his girlfriend, Olivia Arellano, a month earlier.   (Ex. 1, p. 76:3-78:7)

5.        On the night of March 22, 2011 and the morning of March 23, 2011, Leija began to experience hallucinations, seeing things that weren't there, and hearing things that weren't being said. (Ex. 1, p. 79:9-81:7, 82:7-83:4).

6.        On March 23, 2011 at 5:00 p.m., Arellano took Leija off all of the medications.  At 7:00 or 8:00 p.m., Leija began to vomit through the night.   (Ex. 1, p. 83:14-83:17, 86:9-86:13).

7.        On March 24, 2011, at 8:30-9:00 a.m, Arellano took Leija to the INTEGRIS Marshall County Medical Center in Madill, bringing all of Leija's medications with her.  (Ex. 1, 89:18-89:24)

8.        Mr. Leija was admitted into Marshall County Medical Center at 11:00 a.m on March 24, 2011. Upon admission, he was cooperative, responsive, awake, alert, mentally capable, and was in full agreement with being admitted into the hospital and receiving treatment there.  He was however, diagnosed with an acute pneumonia in the lungs and dehydration. The pneumonia reduced Leija's ability to provide oxygen to the tissues of his body. (Ex. 1, p. 90:15-90:19, 95:9-96:2; Ex. "2", Deposition of Melissa Farmer, p.22:7-23:13, Ex. "7," Deposition of Marc Harrison, p. 14:4-14:14 ).

9.        Medical officials at Marshall County Medical Center managed to get Leija's oxygen saturation up from 77% to 88% or above by giving him breathing treatments and putting him on oxygen. When oxygen saturation is low enough, it can affect mental status.   (Ex."3," Deposition of John Conley, p. 21:17-22:23).

10.     Around lunch time, Leija was polite, communicating  well, understood that the doctors were trying to help him, and was accepting and willing to be treated by medical personnel at the hospital.  (Ex. 3, p. 25:20-26:23).

11.     At 5:35 p.m., Leija began to complain of extreme thirst.  (Ex. 2, p. 31:10-31:17).

12.     At 6:10 p.m., Nurse Melissa Farmer ("Farmer") noticed that Leija had severed his IV tubing, disconnected the fresh oxygen  and that  there was blood on the floor and the  toilet. (Ex. 2, p. 33:11-36:4)

13.     Farmer hooked Leija back up to the oxygen and reconnected the IV tubing, and Leija's oxygen saturation increased from 84% to 92%.  During this process, Leija said several times that he wanted Olivia [Arellano], who was his everything, and appeared to be confused.   (Ex.. 2, 38:15-40:6)

14.      Farmer informed Dr. John Conley ("Conley") what was going on, and Dr. Conley ordered that Leija be given 1 mg of Xanax.  Farmer tried to give Leija the Xanax tablet at 6:20 p.m, but Leija stood up, took out his oxygen again, and  yelled at the nurse that he didn't need the medicine and she was telling him lies.  (Ex. 2, p. 40:22-42:21)

15.     Leija became more aggressive, telling the nursing staff not to approach him, and saying that the hospital staff was trying to poison him.  (Ex. 2, p. 44:4-45:5;  Ex. 3, p. 30:1-30:11).

16.     Nurse Farmer asked Dr. Conley for assistance, and Nurse Matt Turvey ("Turvey") was then sent to the room. Turvey tried to calm Leija down, but Leija began to yell that he was Superman, that he was God, that only water was pure enough to help him, and that the hospital staff were telling him lies and trying to kill him.  When Turvey arrived on the scene, Leija had again disconnected his IV and oxygen tubing, and Turvey was concerned that  Leija's oxygen level was

low, causing diminished mental capacity (Ex. 2, 45:6-46:20; Ex. 3, p. 30:20-32:1, Ex. 4, p. Deposition of Matt Turvey, p. 21:14-23:25)

17.     Dr. Conley directed Turvey to administer an injection of Haldol and Ativan to relax Leija so that he could be put back on oxygen and have his IV's and oxygen tubing hooked up again. Dr. Conley was concerned that there had been a significant decline in Leija's mental capacity since earlier that afternoon. After Leija refused to allow Turvey to administer the medication, Turvey did not believe that he and Dr. Conley together could restrain Leija in order to give him medication. Turvey stated that he felt they needed to call police for assistance in administering the medication. Dr. Conley was concerned that Leija was harming himself by removing his oxygen and IV's and refusing medication. (Ex. 3, 34:11-36:17, 86:15-87:6; Ex. 4, p. 25:20-28:3).

18.     At 6:36 p.m., Turvey asked law enforcement officials for assistance with a disturbed patient. Deputy Sheriffs James Atnip and Steve Beebe were eating dinner with Madill Officer Branden Pickens when Pickens received a call to go to the hospital to assist with a combative person. Deputies Atnip and Beebe agreed to assist Officer Pickens. (Ex. 5, Deposition of James Atnip, 33:25-34:15; Ex. 6, Deposition of Steve Beebe, p. 14:20-15:20). (Ex. 4, p. 28:9-28:12)

19.     At 6:40 p.m, Dr. Conley went down to Leija's room and saw that there was blood on the ground and on the toilet, and that Mr. Leija's underwear was pulled down. Leija again stated that the medical staff was trying to poison him, that the only pure thing was water, and that he was God and Superman. Dr. Conley did not believe that Leija had the mental capacity at this point to understand the importance of the treatment he needed. Dr. Conley noted that it was only after Leija's mental capacity deteriorated that he refused medical treatment (Ex. 3, p. 39:1-40:18)

20.     Nurse Turvey and Dr. Conley informed at least one of the law enforcement officials that Leija was suffering from pneumonia, was not thinking or speaking clearly, and that the hospital officials were worried for the patient's safety (Ex. 4, 30:5-30:14)

21.     Upon their arrival at the hospital, Atnip and Beebe saw Leija standing in the hall, yelling and screaming that people were trying to poison and kill him. Leija appeared agitated and upset. (Ex. 5, 39:1-41:17; Ex. 6, 16:24-17:22).

22.     Atnip and Beebe heard Officer Pickens tell Leija that nobody was trying to kill him, and that he needed to let them help him. Atnip heard a female voice say that if Leija left the hospital in that condition, he would die. (Ex. 5, p. 42:2-42:22, Ex. 6, p. 19:21-20:5).

23.     Leija then began to ask Officer Pickens if he wanted to fight, and tore his IV ports out of his hands, causing blood to run out of the wounds and onto the floor. Leija clinched and shook his fists at Officer Pickens as blood came off his hands. (Ex. 5, p. 43:23-45:3; Ex. 6, p. 21:8-21:21).

24.     Officer Pickens moved back towards Atnip and Beebe, and Atnip and Beebe began to command Leija on several occasions to stop, step back, calm down, and get on his knees. Leija turned toward Atnip and Beebe with his fists raised and started stepping toward them. (Ex. 4, 33:5-34:6; Ex. 5, 47:5-48:21; Ex. 6, p. 21:22-22:4).

25.     Beebe drew his Taser out, and both Atnip and Beebe gave Leija repeated commands that he should stop, not come towards them, and get on his knees, and that he would be Tased if he did not comply. Leija did not comply, and continued to aggressively swing his fists around with blood flying everywhere. (Ex. 5, p. 48:19-50:1; Ex. 6, 22:5-22:10, 47:8-47:25).

26.     After several warnings and after Beebe had taken three steps backward, when Leija continued to move toward Atnip and Beebe, Beebe fired the Stinger at Leija, with one prong hitting him in the upper torso. (Ex. 5, p. 50:2-50:12; Ex. 6, p. 22:11-22:25, p. 37:2-37:11).

27.     Leija was not affected when he was hit by one Stinger probe. (Ex. 5, p. 52:15-52:23; Ex. 6, p. 39:14-39:19).

28.     Atnip saw an opportunity to try to restrain Leija, and grabbed Leija's right arm around the wrist and elbow area. Officer Pickens then grabbed Leija's left arm, and they attempted to do an arm bar takedown. (Ex. 5, p. 52:25-53:24).

29.     Leija continued to struggle with the law enforcement officials. Atnip and Pickens were unable to move Leija's arms, but were able to turn Leija to get him against the wall face first. (Ex. 5, p. 54:1-54:11).

30.     Beebe administered a dry sting on Leija's back shoulder in an attempt to relax that muscle so they could move Leija's arm back. This also had no effect on Leija, as he continued to struggle against the law enforcement officials and refused to put his hands behind his back.(Ex. 5, p. 54:12-55:14; Ex. 6, p. 45:11-45:18).

31.     While the law enforcement officials were attempting to subdue Leija, and under the orders of Dr. Conley, Turvey asked them whether they could hold Leija down while he administered a shot of Haldol and Ativan. ( Ex. 3, p. 52:23-53:9; Ex. 4, p. 37:10-38:6,)

32.     Atnip pushed his leg into the bend of Leija's right leg, and the law enforcement officials were able to turn Leija around and push him onto the floor. Deputy Atnip and Officer Pickens held Leija's arms as Beebe attempted to place handcuffs on Leija. (Ex. 5, p. 55:15-56:2; Ex. 6, p. 49:11-50:2)

33.	Beebe put a handcuff on Leija's right wrist and Officer Pickens pulled on Leija's left arm and got a hold of it.  Simultaneously, Nurse Turvey injected Leija in the left butt check with the shot of Haldol and Ativan.  ( Ex. 4, p. 39:10-39:15; Ex. 5, p. 57:17-58:6).

34.	Leija then made a grunting noise and clear fluid began to flow from Leija's mouth or nose..  (Ex. 4, p.39:16-39:25; Ex. 5, 58:7-58:23).

35.	The law enforcement officials backed away, and Nurse Turvey and Doctor Conley felt for a carotid pulse, rolled Leija over into a supine position, and began CPR.  (Ex. 3, p. 53:16-54:6; Ex. 4, p. 40:5-40:11)

36.	Dr. Conley stopped the attempts to revive Leija at 7:29 p.m.  (Ex. 3, p. 54:14-54:18).

37.	The medical examiner determined that Leija's cause of death was respiratory insufficiency secondary to pneumonia, and that the manner of death was natural.  He found that the fluid and inflammation in Leija's lungs, his  enlarged heart, his hypertension, and his coronary artery disease also may have played a role in Leija's death.  The medical examiner could not say, with medical certainty, that the use of a Taser or the struggle with the officers contributed to Mr. Leija's death.(Ex. 7, p 15:2-15:9, 36:7-38:2; 40:15-40:21).

38.	Sheriff Robert Wilder was not at the hospital on the date these events transpired.  (Ex. 8, Deposition of Robert Wilder, p. 23:5-24:7).

39.	Deputies Atnip and Beebe attended the required CLEET training on the use of Stinger or Taser systems on January 28, 2009.  ( Ex. 5, p. 31:16-32:5; Ex. 9, CLEET Training Course Roster Documents.)

40.	The policies and procedures of the Marshall County Sheriff establish that Deputies may not use more force in any situation than is reasonable and necessary under the circumstances,

and that any force used will be in accordance with State law and established departmental policies. (Ex. 10, Marshall County Sheriff Operations Manual, 554.2)

41. Other than a one-week suspension during the investigation of this incident, Deputy Beebe has never received any kind of suspension, discipline, reprimands or probation as a law enforcement officer, and no complaints have ever been lodged against him (Ex. 6, p. 11:1-12:8).

42. As of March 24, 2011, Deputy Beebe had been certified by the State of Oklahoma as a peace officer and had received all yearly required CLEET training to maintain his re-certification. (Ex. 6, 6:21-9:3, Ex. 11, Deputy Beebe's CLEET records).

43. There have not been any complaints or reprimands against Deputy Atnip regarding excessive use of force. Deputy Atnip can also not recall any complaints or reprimands against him regarding improper seizure. (Ex. 5, p. 25:9-28:6)

44. As of March 24, 2011, Deputy Atnip had been certified by the State of Oklahoma as a peace officer and had received all yearly required CLEET training to maintain his re-certification. (Ex. 5, p. 10:17-11:6, 18:24-19:15, Ex. 12, Deputy Atnip's CLEET records)

45. The Marshall County Sheriff has a policy of providing training in all areas necessary to make each Deputy a well-qualified professional, with special emphasis on developing reasoning ability, judgment, and community interaction, and providing refresher training to experienced Deputies to update their training and to evaluate the effectiveness of their prior training. (Ex. 10, 670.00, 670.10, 670.30).

46. The Marshall County Sheriff has a policy that when Deputies pursue an investigation, a detention, a search, or an arrest, they must always act within the limits of their authority as defined by statute, judicial interpretation, and departmental policy. (Ex. 10, 510.0)

47. Sheriff Robert Wilder is at the top of the chain of command for the Sheriff's Department, and does not report to anyone other than the people of Marshall County.   He is the one who adopts policies and guidelines for the Sheriff's Department   (Ex. 8, p. 10:10-10:14, 14:16-14:22, 17:17-17:22)

## ARGUMENT AND AUTHORITY

### STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

In *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 249 (1986), the Supreme Court held that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."   The Court further held that "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id.*   In addition, the *Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* At 266.   A movant's summary judgment burden may properly be met by reference to the lack of evidence in support of a plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526 (10th Cir. 1994), "[e]ven though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Id.* at 530 (citing *Celotex*, 477 U.S. at 324); *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); Moreover, "(i)n response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

## A. 1983 CLAIM AGAINST THE BOARD OF COUNTY COMMISSIONERS OF MARSHALL COUNTY

Plaintiff brings a §1983 claim against the Board. In Oklahoma, it is the Sheriff, not the Board of County Commissioners, that is responsible for Deputy Sheriffs' alleged constitutional violations. In *Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988), the Tenth Circuit stated that county commissioners cannot be held liable for Deputies' alleged use of force. The court stated that "[u]nder Oklahoma law, Oklahoma County has no statutory duty to hire, train, supervise or discipline the county sheriffs or their deputies." *Id*. at 1528 (citations omitted). The court further provided that "[c]onsequently, unless the Commissioners voluntarily undertook responsibility for hiring or supervising county law enforcement officers, which is not alleged, they were not 'affirmatively linked' with the alleged acts." *Id*. (citations omitted). Likewise, in *Jantzen v. Board of County Commissioners of Canadian County*, 188 F.3d 1247 (10th Cir. 1999), the Tenth Circuit specifically held that the Board of County Commissioners may not be held liable for violating § 1983 due to actions of the sheriff's department absent a showing that the sheriff or the deputy in question was executing an unconstitutional policy or custom of the Board itself. *Id*. at 1259 (citing *Monell v. Dept.*

*of Social Services of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Clark v. City of Draper*, 168 F. 3d 1185, 1187 n.5 (10th Cir. 1999)).

Here, there is simply no allegation that the Board intervened in the Sheriff's training, supervision, or education of the Deputy Sheriffs, including the proper use of Tasers/Stingers or other proper/improper uses of force. Nor is there any allegation that the Sheriff was executing a policy or custom of the Board in improperly training, supervising or educating the Deputy Sheriffs. Accordingly, there simply is no "affirmative link" to tie the Board to the alleged violation of Leija's constitutional rights.

Pursuant to Okla. Stat. Tit. 19, §§ 131 and 547, the Sheriff is an independently elected official and shall be responsible for the official acts of his undersheriff and deputy sheriffs. Conversely, the general powers of the Board are set forth in Okla. Stat. tit. 19, § 339. The limits of these powers are strictly construed. *Allen v. B'd of Commissioners of Pittsburg County*, 1911 OK 130, ¶ 2, 116 P. 175. The Board may not exercise any authority not expressly granted in the statutes or arising by necessary implication from the statutory powers. *Lairmore v. Board of Commissioners of Okmulgee County*, 1948 OK 163, 195 P.2d 762, 764 (quoting *In re Assessment of First Nat. Bank of El Reno*, 1917 OK 392, 166 P. 883, 884); Under § 339, the Board appropriates the funds for each county official and may audit the disbursement of those funds.

As depicted in the statutory scheme for county government, the office of Sheriff and the office of the Board are autonomous positions with separate, and specifically delineated, spheres of authority. Unlike many municipal systems of government, in which law enforcement officials answer to the city council, the Sheriff's department and the Board are not part of a single chain of command. The Sheriff is the sole policy maker and final authority with regard to the supervision and training

of Deputy Sheriffs. The Board is therefore not a proper party for Plaintiff's claims under 42 U.S.C.
§ 1983, and summary judgment must be granted in favor of the Board on all §1983 claims.

### B. TORT CLAIM AGAINST BOARD

Plaintiff also brings a pendant state tort claim against the Board. The Board is entitled to
summary judgment because it is immune from liability and suit for Plaintiff's tort claim pursuant to
the terms of the Oklahoma Governmental Tort Claims Act ("OGTCA"). The OGTCA is the
exclusive remedy by which an injured plaintiff may recover against an Oklahoma governmental
entity in tort. *Fuller v. Odom*, 1987 OK 64, ¶¶ 3-4, 741 P.2d 449. *See also* Okla. Stat. tit. 51, §
153(B). In the OGTCA, Okla. Stat. tit. 51, § 152.1(A), the legislature adopted and reaffirmed
sovereign immunity for the State, its political subdivisions, and all employees acting within the scope
of their employment. This immunity is subject to a limited waiver to the extent and the manner
specifically provided for by the provisions of the other sections of the Act. Okla. Stat. tit. 51, §
152.1(B). In the OGTCA, the Legislature provided several exemptions from the limited waiver of
immunity liability for political subdivisions like the Board. Okla. Stat. tit. 51, § 155. In other words,
the state and its political subdivisions do not always consent to suit, but rather retain their essential
sovereign immunity in certain cases. In this regard, Okla. Stat. tit. 51, § 155(6) affords the state or
a political subdivision immunity for "the method of providing police, law enforcement or fire
protection." Okla.Stat. tit. 51, § 155(6)

The Oklahoma Supreme Court interpreted this provision in *Schmidt v. Grady County*, 1997
OK 92, 943 P.2d 595. In that case, an individual was employed as the Deputy Sheriff of Grady
County, Oklahoma. While acting within the scope and during the course of his employment as
Deputy Sheriff, the Deputy took the Plaintiff into custody to protect her from harming herself or

others and from being harmed by others. *Id.* at 596. The Court determined that the "Grady County deputy sheriff was acting as a police officer in relation to the plaintiff. The deputy was providing police protection to the plaintiff and public when she jumped or fell from the patrol car. Thus any injury suffered by the plaintiff was a result of the county's method of providing police protection making the county immune from suit." *Id.* at 598. The Court concluded, " We hold subsection 155(6) provides immunity for a political subdivision for liability for personal injuries resulting from the acts of its employees acting within the scope of their employment in taking into protective custody and transporting a person to the county jail." *Id.*

In *Salazar v. City of Oklahoma City*, the Oklahoma Supreme Court again interpreted *Schmidt* and found that in *Schmidt*, the court held that when Plaintiff sustained the harm, the deputy was "providing [to the plaintiff] police protection." The Court noted that "*Schmidt* deals not with an arrestee but with a person in need of protection from harming herself or others. It does not involve negligence in driving but failure to put a passenger under some type of restraint. Rather than carrying out a law enforcement function, the officer in *Schmidt* was protecting a woman from the consequences of her disturbed mental state." *Salazar v. City of Oklahoma City*, 1999 OK 20, 976 P.2d 1056, 1067.

Again, in *Kuruzhkov v. State*, the Court of Civil Appeals ruled that the government and its officers and employees are immune from suit for their failure to protect a Plaintiff from himself. 2006 OK CIV APP 114, 144 P.3d 186, 192.

Here, it is undisputed that Leija, who was suffering from pneumonia, was yelling that he was Superman, that he was God, that only water was pure enough to help him, and that the hospital staff were telling him lies and trying to kill him. Furthermore, Leija was disconnecting his IV and oxygen

tubing, and his oxygen level was dangerously low, causing diminished mental capacity. (Undisputed Fact No. 16). Further, it is undisputed that Deputies Atnip and Beebe were not brought to the hospital to arrest Leija, but to assist Dr. Conley and Nurse Turvey in subduing Leija so that he could be given his medication and proper medical treatment. Like the law enforcement officials in *Salazar, supra*, Deputies Atnip and Beebe were protecting Leija from the consequences of his disturbed mental state, namely the very real possibility that he could die of severe pneumonia. As such, Deputies Atnip and Beebe were not carrying out a law enforcement function, but were "providing police protection." Therefore, Title 51, Okla. Stat. §155(6) provides immunity for the political subdivision from liability for the acts of Deputies Atnip and Beebe while acting within the scope of their employment. As the OGTCA is the exclusive means by which the Board can be sued in state tort law, Plaintiff's tort claim against the Board therefore cannot survive summary judgment.

Even, assuming arguendo, that this Court determines that the OGTCA does not preclude Plaintiff's tort claim against the Board, the actions of Atnip and Beebe were not the direct, or proximate, cause of Leija's death. In a wrongful death case, "one of the essential elements of actionable negligence requires that the act or omission complained of be the *direct cause* of the harm for which liability is sought to be imposed." *Graham v. Keuchel*, 1993 OK 6, 847 P.2d 342, 348. "Direct cause means a cause which, in a natural and continuous sequence, produces injury and without which the injury would not have happened. For negligence to be a direct cause it is necessary that some injury to a person or to the property of a person in Plaintiff's situation must have been a reasonably foreseeable result of negligence." *Stround v. Arthur Anderson & Co.*, 2001 OK 76, 37 P.3d 783, 791. "Further, whether the complained of negligence is the proximate cause of the plaintiff's injury is dependent upon the harm (for which compensation is sought) being the result of

14

*both* the natural and probable consequences of the primary negligence." *Lockhart v. Loosen*, 1997 OK 103, 943 P.2d 1074, 1079 (emphasis in original).

Here, the medical examiner determined that Leija's cause of death was respiratory insufficiency secondary to pneumonia, and that the manner of death was natural. He found that the fluid and inflammation in Leija's lungs, his enlarged heart, his hypertension, and his coronary artery disease all may have played a role in Leija's death. The medical examiner could not say, with medical certainty, that the use of a Taser or the struggle with the officers contributed to Mr. Leija's death. (Undisputed Fact No. 37). For Defendant Board to be liable under a tort theory of negligence, Plaintiff must prove that Plaintiff's death would not have happened without the actions of Defendants Atnip and Beebe. The definitive authority on the cause of Mr. Leija's death is Medical Examiner Harrison, and the Medical Examiner cannot say that either the use of a Taser or the struggle with the officers contributed to Mr Leija's death. There is simply no evidence here that Deputy Atnip and Beebe's actions were a cause without which M. Leija's injury ( death) would not have happened. As such, Plaintiff has not presented a prima facie case of negligence against Defendant Board, and even looking at the facts in the light most favorable to the Plaintiff, Plaintiff's tort claim for negligence against the Board cannot survive summary judgment.

## CONCLUSION

For the legal and factual reasons set forth in this Motion and Brief, Defendant Board of County Commissioners of Marshall County respectfully requests this Court grant summary judgment in its favor on all claims alleged in Plaintiff's 1st Amended Petition.

Respectfully submitted,

s/ Philip W. Anderson
Chris J. Collins, OBA No. 1800
Philip W. Anderson, OBA No. 16402
COLLINS, ZORN & WAGNER, P.C.
429 NE 50th, Second Floor
Oklahoma City, Oklahoma 73105
Telephone:     (405) 524-2070
Facsimile:     (405) 524-2078
Email: cjc@czwglaw.com
          panderson@czwglaw.com


Attorneys for Defendant Board of County
Commissioners of Marshall County


## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2012, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Jeremy Beaver, OBA No. 18645 | Eric D. Janzen, OBA 13826 |
| Warren Gotcher, OBA No. 3495 | Steidley & Neal, P.L.L.C. |
| GOTCHER AND BEAVER | CityPlex Towers, 53rd Floor |
| 323 E. Carl Albert Parkway | 2448 E. 81st Street |
| P.O. Box 160 | Tulsa, Ok 74137 |
| McAlester, Oklahoma 74502 | edj@steidley-neal.com |
| Telephone:  (918) 423-0412 | ATTORNEY FOR THE CITY OF |
| Facsimile: (918) 423-7363 | MADILL, BRANDON PICKENS |
| Jeremy@gotcher-beaver.com | AND MADILL CHIEF OF |
| warren@gotcher-beaver.com | OF POLICE JAMES FULLINGIM, |
| ATTORNEYS FOR PLAINTIFF | in his individual and official capacity. |