IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ERMA ALDABA, personal representative and next of kin to JOHNNY MANUEL LEIJA, Deceased,<br><br>      Plaintiff,<br><br>vs.<br><br>THE BOARD OF MARSHALL COUNTY COMMISSIONERS; JAMES ATNIP; STEVE BEEBE; Marshall County Sheriff ROBERT WILDER, in his individual and official capacity; THE CITY OF MADILL, a municipal corporation; BRANDON PICKENS; Madill Chief of Police JAMES FULLINGIM, in his individual and official capacity,<br><br>      Defendant. | No. <u>CIV 12-085-FHS</u> |

**THE CITY OF MADILL AND BRANDON PICKENS' MOTION FOR SUMMARY
JUDGMENT AND BRIEF IN SUPPORT**

STEIDLEY & NEAL, P.L.L.C.

*Attorneys for Defendants*
*The City of Madill, Brandon Pickens and*
*James Fullingim*

By:   <u>s/ Clark W. Crapster</u>
      Eric D. Janzen, OBA #13826
      edj@steidley-neal.com
      Clark W. Crapster, OBA #22112
      cwc@steidley-neal.com
      CityPlex Towers, 53rd Floor
      2448 E. 81st Street
      Tulsa, Oklahoma  74137
      918/664-4612 (telephone)
      918/664-4133 (facsimile)

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF THE CASE ...................................................................... 4

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS ............................ 5

IV.    ARGUMENT & AUTHORITIES ................................................................. 9

       A.     SUMMARY JUDGMENT STANDARD ........................................ 9

       B.     PLAINTIFF'S § 1983 CLAIM FAILS AS A MATTER OF LAW .............. 10

              1.     Officer Pickens did not commit a constitutional violation ................ 10
              2.     Officer Pickens is entitled to qualified immunity ............................ 14

       C.     PLAINTIFF'S TORT CLAIM FAILS AS A MATTER OF LAW ............... 16

V.     CONCLUSION ............................................................................................ 17

# TABLE OF AUTHORITIES

## Cases:

*Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250 (1986) ........................................................ 9

*Celotex Corp. v. Catrett,,* 477 U.S. 242 (1986) ................................................................ 9, 10

*Cortez v. McCauley,* 478 F.3d 1108, 1126 (10th Cir. 2007) ........................................... 12, 14

*Cruzan v. Director, MDH,* 497 U.S. 261 (1990) .................................................................. 13

*Dominque v. Telb,* 831 F.2d 673, 677 (6th Cir. 1987) ............................................................. 15

*Graham v. Connor,* 490 U.S. 386, 396 (1989) ...................................................................... 12

*Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) ................................................................... 14

*Meyer v. Board of County Com'rs of Harper County,* 482 F.3d 1232, 1239
 10th Cir. 2007) .......................................................................................... 10, 12, 13

*Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) ..................................................................... 14

*Morales v. City of Oklahoma City,* 230 P.3d 869, 876 (Okla. 2010) .................................... 16

*Pearson v. Callahan,* 129 S.Ct. 808, 815 (2009) ................................................................. 14

*Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 646 (10th Cir. 1988) 15

*Pino v. Higgs,* 75 F.3d 1461, 1468 (10th Cir. 1996) ........................................................ 10, 15

*Saucier,* 533 U.S. at 202 ................................................................................................ 14, 16

*Schmidt v. Grady County,* 943 P.2d 595, 597-98 (Okla. 1997) ............................................ 16

*Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) .................... 15

## Statutes:

Okla. Stat. tit. 43A § 1-103, 5-207 .......................................................................... 10, 12, 16

Okla. Stat. tit. 51 § 155(6) ......................................................................................... 5, 16, 17

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

ERMA ALDABA, personal representative
and next of kin to JOHNNY MANUEL
LEIJA, Deceased,

       Plaintiff,

vs.

THE BOARD OF MARSHALL COUNTY
COMMISSIONERS; JAMES ATNIP;
STEVE BEEBE; Marshall County Sheriff
ROBERT WILDER, in his individual and
official capacity; THE CITY OF MADILL, a
municipal corporation; BRANDON
PICKENS; Madill Chief of Police JAMES
FULLINGIM, in his individual and official
capacity,

       Defendant.

No. <u>CIV 12-085-FHS</u>

## THE CITY OF MADILL AND BRANDON PICKENS' MOTION FOR SUMMARY <u>JUDGMENT AND BRIEF IN SUPPORT</u>

In support of their Motion for Summary Judgment, the City of Madill and Brandon Pickens would show the Court as follows:

## I. <u>INTRODUCTION</u>

On the evening of March 24, 2011, Johnny Manuel Leija, an admitted patient at Integris Marshall Memorial Hospital, had to be restrained for his health. Blood was dripping from his arms, where he had removed his own IV's. The medical personnel, including the doctor, did not want to personally restrain him, because they were intimidated by his suddenly aggressive, illogical, and delusional behavior. He was rejecting critical treatment for his severe pneumonia, and his health was at risk deteriorating very quickly. His behavior was in stark contrast to his normal personality earlier that morning, when he voluntarily presented to the emergency room.

1

(Exhibit 1, Depo. Of Dr. Conley, pgs. 16-20, 24-25, 35-36.) (Exhibit 2, Medical Report of Dr. Conley).

He began yelling at medical personnel. He called himself "God" and "Superman," removed his oxygen, apparently chewed through his IV tubes, and stood in his bathroom with his underwear pulled down demanding more water to drink. (Exhibit 3, Depo. of Matt Turvey, pgs. 23); (Exhibit 4, Depo. of Melissa Farmer, pgs. 43-46). Blood was visible on his bathroom's toilet, floor, and wall. (Exhibit 3, Depo. of Matt Turvey, pgs. 20-25). He even claimed the medical personnel were trying to poison him, kill him, and tell him lies; he continued to refuse medical treatment and would not allow medical personnel to approach him—he wanted to leave the hospital. (Exhibit 4, Depo. of Melissa Farmer, pgs. 42-44).

Quite reasonably, medical personnel and the doctor concluded that Leija no longer had the mental capacity to make sound decisions, and they did not believe they could handle Leija without help from law enforcement. (Exhibit 1, Depo. Of Dr. Conley, pgs. 37-38); (Exhibit 3, Depo. of Matt Turvey, R.N., pgs. 24-26). They called law enforcement for help. (Exhibit 3, Depo. of Matt Turvey, pgs. 27-28).

Three responding officers arrived, and shortly thereafter, Leija exited his room in his hospital gown, and proceeded down the hallway. (Exhibit 1, Depo. Of Dr. Conley, pgs. 39-42). Two of the responding officers, Mr. James Atnip and Steve Beebe, worked for the County of Marshall. (Plaintiff's Amended Petition, ¶ 6).

The third officer, Brandon Pickens, worked for the City of Madill. (Plaintiff's Amended Petition, ¶ 7). Officer Pickens and the City of Madill are the Defendants bringing the instant Motion.

2

Leija had told Officer Pickens that he was leaving the hospital. (Exhibit 8, Depo. of Jeremiah Preston, pgs. 28-29). Matt Turvey, an ER nurse who had been called to assist, had already explained to the officers that they were worried for their patient's safety and that death was a possibility if he were to leave the facility. (Exhibit 3, Depo. of Matt Turvey, pgs. 30 and 34). Leija clearly had to be stopped.

The officers moved in front of Leija hoping to reason with him. (Exhibit 3, Depo. of Matt Turvey, pgs. 31-32); (Exhibit 1, Depo. Of Dr. Conley, pgs. 47). Officer Pickens tried to convince him to go back to his room, but Leija said "[the hospital staff] were trying to kill him." (Exhibit 5, Depo. of Officer Pickens, pgs. 20-21). Leija faced the officers with his fists clenched. (Exhibit 6, Depo. of Officer Beebe, pgs. 36-37). Leija raised his arms up and began yelling that this was his blood. (Exhibit 5, Depo. of Officer Pickens, pgs. 26-27). Pickens and the other officers began backing up as Leija continued toward the lobby exit.

The policemen yelled at Leija to stop and to get to his knees, but he continued to advance. (Exhibit 1, Depo. Of Dr. Conley, pgs. 47-48). Officer Beebe, of Marshall County, used his stinger gun on Leija. (Plaintiff's Amended Petition, ¶ 12). Leija became more agitated but continued walking unaffected. (Exhibit 3, Depo. of Matt Turvey, pgs. 35-36). It was clear that Leija would not listen to reasoning, and would not stop unless the officers forced him. Due to Leija's plainly delusional thinking and resistance to the officers' efforts, his health now depended on the officers using physical force to restrain him. Pickens would later testify: "It was my job to save his life. I did the best I knew how." (Exhibit 5, Depo. of Officer Pickens, pg. 21).

As Leija entered the lobby area, Officer Pickens took Leija's left arm; Leija was resisting with such force that Pickens could not move Leija's arm or bring Leija to the ground even with Officer Atnip attempting the same task on Leija's right side. (Exhibit 5, Depo. of Officer

3

Pickens, pgs. 29-33); (Exhibit 9, Depo. of Officer Atnip, pgs. 53-57).   Leija struggled against their efforts and resisted. Officer Pickens and Atnip were only able to bring Leija to the ground by his arms when Officer Atnip pushed his leg into the bend of Leija's leg. (Exhibit 5, Depo. of Officer Pickens, pgs. 29-33) ); (Exhibit 9, Depo. of Officer Atnip, pgs. 53-57). Once on the ground, Pickens continued only to try to bring Leija's arm behind his back, yet Leija continued to resist forcefully the whole time. As Pickens was losing his grip on Leija's left arm, Leija suddenly went limp, lost consciousness, and was unable to be resuscitated. (Exhibit 5, Depo. of Officer Pickens, pgs.31-33). Pickens was never on Leija's back and never used any taser-type device. (Exhibit 5, Depo. of Officer Pickens, pgs. 31-33).

The cause of death in the medical report was cardiopulmonary arrest and the autopsy examiner, Dr. Marc Harrison, a forensic pathologist, concluded the cause of death was acute bilateral pneumonia which caused respiratory insufficiency. According to the examining doctor, Leija died of natural causes. (Exhibit 7, Depo. of Dr. Marc Harrison, pg. 15).

## II. STATEMENT OF THE CASE

Based on these events, which are now indisputable parts of the record, Plaintiff Erma Aldaba, Leija's personal representative, who was not present to witness the tragedy for herself, is suing Officer Pickens under § 1983, and the City of Madill under state tort law. [1] She believes that they should be liable for Pickens' efforts to help Leija.

Both of these claims must fail as a matter of law.   Based on the indisputable record, Pickens committed no constitutional violation. Independent of that fact, he is protected by the

---

[1] Plaintiff had also brought 1983 claims against the City of Madill and Chief Fullingim, but she has now dismissed those claims. Document No. 52. Plaintiff has also dismissed the individual tort claim against Pickens. Document No. 17. With respect to the City of Madill Defendants, therefore, there is no pending claim against Fullingim. The only remaining claims as to the City of Madill Defendants are the 1983 claim against Officer Pickens, and the state tort claim against the City of Madill.

doctrine of qualified immunity in these circumstances. As to the tort claim against the City of Madill, it is immune under OKLA. STAT. tit. 51, § 155(6), because Pickens' efforts to detain Leija were for the very purpose of protecting Leija from causing significant harm to himself.

The undisputed material facts of this case are as follows:

### III. STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Leija voluntarily presented to the emergency room at Integris on the morning of March 24, 2011. He suffered from hypoxia (low oxygen level), was diagnosed with severe pneumonia in both lungs and was admitted to Integris. (Exhibit 2, Medical Report of Dr. Conley).

2.     Leija needed oxygen and intravenous antibiotic treatment because without such medical care Leija's serious condition could have quickly deteriorated even further. (Exhibit 1, Depo. Of Dr. Conley, pgs. 32-33, pgs. 83-84); (Exhibit 3, Depo. of Matt Turvey, pg. 34).

3.     At approximately 6:00 p.m., Ms. Farmer observed that Leija, who was in his bathroom without his oxygen and bleeding from his arms, had somehow managed to sever his IV tubing in his arms. (Exhibit 4, Depo. of Melissa Farmer, pgs. 33-34).

4.     For unknown reasons, Leija's anxiety level increased, but he refused to take medication to ease his anxiety. (Exhibit 4, Depo. of Melissa Farmer, pgs. 40-41).

5.     Ms. Farmer testified that Leija refused treatment, became "very anxious," and said: "You are just telling me lies, just more secrets." (Exhibit 4, Depo. of Melissa Farmer, pg. 42).

6.     Leija started "yelling, becoming more aggressive and [Ms. Farmer] called and notified Dr. Conley." (Exhibit 4, Depo. of Melissa Farmer, pg. 42).

7.     Ms. Farmer reported that Leija became more aggressive with his body language, continued yelling, and would not allow medical personnel to approach him. (Exhibit 4, Depo. of Melissa Farmer, pgs. 43-44).

8.      Ms. Farmer was concerned for her safety due to Leija's yelling and body language, so she called Dr. Conley again for additional medical personnel to assist her.  (Exhibit 4, Depo. of Melissa Farmer, pgs. 43-45).

9.      When Matt Turvey, a male nurse from the ER, arrived to assist Ms. Farmer, Leija began yelling "I am Superman. I am God. You are telling me lies and trying to kill me."  (Exhibit 4, Depo. of Melissa Farmer, pg. 46).

10.     Turvey testified that when he arrived in Leija's room, he noticed that Leija had removed his IV's and that there was blood on the bathroom wall, on the toilet, and on the bathroom floors. (Exhibit 3, Depo. of Matt Turvey, pgs. 20-25).

11.     Turvey testified that he tried to calm Leija down but Leija continued to say they were trying to poison him, that he was "God" and "Superman," and that only water was pure enough for him. (Exhibit 3, Depo. of Matt Turvey, pgs. 23).

12.     Leija was consuming large amounts of water. (Exhibit 1, Depo. Of Dr. Conley, pgs. 36-37).

13.     Turvey testified that, in his opinion based on his observations of Leija at the time, Leija no longer had the mental capacity to determine his proper medical treatment. (Exhibit 3, Depo. of Matt Turvey, pgs. 24).

14.     Turvey also did not believe that he and Dr. Conley could handle Leija without help from law enforcement. (Exhibit 3, Depo. of Matt Turvey, pgs. 24-26).

15.     With Dr. Conley's approval, Turvey called the Marshall County sheriff's office for assistance with a "disturbed patient." (Exhibit 3, Depo. of Matt Turvey, pgs. 27-28).

16.     Dr. Conley arrived in Leija's room to assist Turvey and also heard Leija state that they were trying to poison him, that he was "God," that he was "Superman," and that only water was pure enough for him. (Exhibit 1, Depo. Of Dr. Conley, pgs. 32-33).

17.     This was a complete behavioral and personality change from what Dr. Conley had perceived earlier in the day when he met with Leija, which caused Dr. Conley to be more concerned for Leija's health. (Exhibit 1, Depo. Of Dr. Conley, pgs. 32-33, 36).

18.     Dr. Conley believed there was a need for an Emergency Detention, that he would need to secure Leija to his bed to treat and evaluate his condition—but Dr. Conley did not believe that he and Matt Turvey could have secured Leija to the bed to resume his treatment without assistance from law enforcement. (Exhibit 1, Depo. Of Dr. Conley, pgs. 32-33, 36-38).

19.     Dr. Conley was also intimidated by Leija's conduct and left Leija's room after Leija started to step toward Dr. Conley. (Exhibit 1, Depo. Of Dr. Conley, pgs. 41-42); (see also Exhibit 2, Medical Report of Dr. Conley, explaining that he observed patient becoming very aggressive and visibly agitated in addition to refusing treatment).

20.     At that point, three responding police officers arrived: James Atnip and Steve Beebe, of the County of Marshall, (Plaintiff's Amended Petition, ¶ 6), and Brandon Pickens, of the City of Madill.  (Plaintiff's Amended Petition, ¶ 7).

21.     Matt Turvey recalls that, when the responding officers arrived, he and Dr. Conley communicated Leija's behavior and his need for treatment to the police officers. Nurse Turvey recalls explaining that the medical personnel were worried for the patient's safety and that death was a possibility if Leija were to leave the facility. (Exhibit 3, Depo. of Matt Turvey, pgs. 30 and 34).

22.     After the officers had arrived, Leija left his room in his gown and proceeded down the hallway. (Exhibit 1, Depo. Of Dr. Conley, pgs. 39-42).

23.     Officer Pickens was told by medical personnel that Leija was sick, that he could die if he left the hospital, and that he was acting as if he were on some sort of drug. (Exhibit 5, Depo. of Officer Pickens, pg. 19).

24.     Indeed, nurse Jeremiah Preston heard Leija tell Officer Pickens that he was leaving the hospital; Jeremiah Preston also heard Officer Pickens ask Matt Turvey, an attending nurse, if Leija could leave the hospital, and Matt Turvey said "If he does, he's going to die." (Exhibit 8, Depo. of Jeremiah Preston, pgs. 28-29).

25.     Officer Pickens tried to convince Leija to go back to his room, but Leija said "they [the hospital staff] were trying to kill him". (Exhibit 5, Depo. of Officer Pickens, pgs. 20-21).

26.     Dr. Conley recalled that Leija then pulled the remaining intravenous needles from his arms causing blood to come out. (Exhibit 1, Depo. Of Dr. Conley, pgs. 47).

27.     Leija showed an aggression and desire to leave, and he left a trail of blood droplets as he walked down the hall. (Exhibit 1, Depo. Of Dr. Conley, pg. 46).

28.     After Officer Pickens spoke to Leija, Leija faced the officers and clenched his fists. (Exhibit 6, Depo. of Officer Beebe, pgs. 36-37).

29.     Leija removed the gauze and tape off of his arms, causing more bleeding; and he raised his arms up and began yelling that this was "his blood." (Exhibit 5, Depo. of Officer Pickens, pgs. 26-27).

30.     Both Dr. Conley and Matt Turvey saw Leija continuing down the hall toward the lobby exit, and the officers backing away from him as he did so. (Exhibit 1, Depo. Of Dr. Conley, pg. 47); (Exhibit 3, Depo. of Matt Turvey, pg. 33).

8

31.    The officers yelled at him to stop and to get to his knees, but Leija continued to advance down the hallway, disregarding their commands. (Exhibit 1, Depo. Of Dr. Conley, pgs. 47-48).

32.    Officer Beebe used his stinger gun on Leija. (Plaintiff's Amended Petition, ¶ 12).

33.    Officer Pickens, however, did not and never did use a stinger or any taser-type device on Mr. Leija. (Plaintiff's Amended Petition, ¶ 12).

34.    Leija became more agitated but was unaffected by Beebe's stinger. (Exhibit 3, Depo. of Matt Turvey, pgs. 35-36).

35.    In the lobby area, Officer Pickens grabbed Leija's left arm, Officer Atnip took Leija's right arm, but they were unsuccessful in putting Leija's arms behind his back or bringing him to the ground until Officer Atnip pushed his leg in the bend of Leija's right leg. (Exhibit 5, Depo. of Officer Pickens, pgs. 29-33); (Exhibit 9, Depo. of Officer Atnip, pgs. 53-57).

36.    Once Leija was on the ground, Leija began attempting to straighten his left arm out, resisting Officer Pickens' grip. (Exhibit 5, Depo. of Officer Pickens, pgs. 31-33). Just as Pickens was losing his grip on Leija's left arm, Leija went limp and vomited a clear fluid. (Exhibit 5, Depo. of Officer Pickens, pgs. 31-33). The officers immediately moved away and medical personnel unsuccessfully attempted to revive Leija. (Exhibit 5, Depo. of Officer Pickens, pgs. 31-33).

## IV.  ARGUMENT & AUTHORITIES

### A.    SUMMARY JUDGMENT STANDARD

When there is no substantial conflict as to a genuine issue of material facts that would control the outcome, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 242 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral

part of the Federal Rules as a whole, which are designed to secure the just, speedy and

inexpensive determination of every action." *Celotex*, supra, at 327.

**B.    PLAINTIFF'S § 1983 CLAIM FAILS AS A MATTER OF LAW**

### *1. Officer Pickens did not Commit a Constitutional Violation*

It is well established that a police officer may, and in fact, "shall," detain an individual

for mental evaluation or medical care where there is probable cause that the individual is

suffering from mental impairment and posing a danger to himself or others. *See* Okla. Stat. tit.

43A, § 5-207; *Meyer v. Board of County Com'rs of Harper County*, 482 F.3d 1232, 1239 (10th

Cir. 2007). Section 5-207 provides specifically:

> A. Any person who appears to be or states that such person is mentally ill,
> alcohol-dependent, or drug-dependent to a degree that immediate emergency
> action is necessary may be taken into protective custody and detained as provided
> pursuant to the provisions of this section. Nothing in this section shall be
> construed as being in lieu of prosecution under state or local statutes or
> ordinances relating to public intoxication offenses.
>
> B. 1. Any peace officer who reasonably believes that a person is a person
> requiring treatment as defined in Section 1-103 of this title ***shall*** take the person
> into protective custody. The officer shall make every reasonable effort to take the
> person into custody in the least conspicuous manner. § 5-207 (emphasis added).

Under Okla. Stat. tit. 43A, § 1-103, "'Mental illness' means a substantial disorder of thought,

mood, perception, psychological orientation or memory that significantly impairs judgment,

behavior, capacity to recognize reality or ability to meet the ordinary demands of life." § 1-

103(3). "'Care and treatment' means medical care and behavioral health services, as well as

food, clothing and maintenance, furnished to a person." § 1-103(9). The Tenth Circuit has

explained that probable cause in this context means cause to believe the individual poses a

danger to himself or others. *E.g., Pino v. Higgs*, 75 F.3d 1461, 1468 (10th Cir. 1996).

Here, it is indisputable that Leija demonstrated remarkable signs of mental unsoundness and irrational thinking. (Undisputed Facts Nos. 3-16). It goes without saying that his statements—to the effect that the hospital was trying to kill him and that he was God, etc.—were immediately recognizable as illogical and delusional. He would, moreover, not let medical personnel approach him. (Undisputed Fact No. 7). His conduct intimidated the nurses, and the doctor. (Undisputed Facts Nos. 8, 14, 19). In diametrical contrast to the normal thought process he demonstrated earlier that day, he could no longer even understand that he needed medical treatment, oxygen or antibiotics. He believed such care was harming him. (Undisputed Facts Nos. 11, 25). He could not comprehend that walking out of the hospital in his gown and in his condition would place his health in serious danger. What he would do after the leaving the hospital and how quickly his health would deteriorate was anybody's guess.

As a matter of law, Leija appeared to have a substantial disorder of thought and mood impairing his judgment. Reasonable minds could not conclude otherwise on these facts.

Due to his behavior, the medical personnel did not believe Leija could make informed decisions about his health. (Undisputed Facts Nos. 13, 18). Pickens was told that if Leija were allowed to simply walk away from his treatment, he would be putting his health in serious danger. (Undisputed Facts Nos. 21, 23, 24). In fact, as Officer Pickens was informed, if Leija abandoned his treatment he could die. (Undisputed Facts Nos. 21, 23, 24). Thus, as a matter of law, Pickens had probable cause to believe that Leija was suffering from mental impairment, that he was posing a danger to himself, and that an emergency detention of Leija was absolutely necessary. It was, therefore, completely proper and lawful for Officer Pickens to take Leija into custody so that the doctor and medical personnel on site could evaluate and treat Leija's

disconcerting and increasingly serious condition. *See* Okla. Stat. tit. 43A, § 5-207; *Meyer*, 482 F.3d at 1239.

Plaintiff cannot legitimately claim that the force used by Pickens was unreasonable. "The right to make an arrest or investigatory stop carries with it the right to use some degree of physical coercion or threat thereof to affect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The excessive force inquiry "evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances." *Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007). Here, Pickens tried to stop Leija with words, his presence, and minimal force, but Leija ignored and resisted against all attempts. (Undisputed Facts Nos. 31-36). The only force used by Pickens was taking Leija's left arm and ultimately using it to try to bring Leija to the ground so he could be detained. Leija would not allow himself to be detained any other way. (Undisputed Facts Nos. 31-36). Leija was resisting with such force, in fact, that Pickens could not move Leija's left arm or bring Leija to the ground even with Atnip holding the right arm and making the same efforts on the right side of Leija's body. (Undisputed Facts Nos. 31-36). Pickens did not use a stinger or taser-type device, and only put pressure on Leija's left arm. (Undisputed Facts Nos. 31-36). Once Officer Atnip used his leg to allow Leija to be brought to the ground, Pickens continued to attempt to bring Leija's left arm behind his back. Leija fought Pickens the whole time. (Undisputed Facts Nos. 31-36). Pickens was losing his grip on Leija's left arm when Leija suddenly went limp, lost consciousness and was unable to be resuscitated. (Undisputed Fact No. 36).

Given the critical need to detain Leija and his strong resistance against all the Officers' collective efforts to stop him, the force used by Pickens on Leija's arm was plainly the minimum necessary to detain Leija. It is important to note, moreover, that the testimony of the medical

personnel and the officers also shows that Leija was acting in an aggressive manner. (Undisputed Facts Nos. 6, 8, 19, 29, 30, 31). He appeared to pose a danger to the medical personnel and the officers trying to help him. (Undisputed Facts Nos. 6, 8, 19, 29, 30, 31). He clenched his fists, faced the officers, held up his bleeding arms, and continued to walk toward the officers, despite their orders for him to stop and to drop to his knees. (Undisputed Facts Nos. 28-30). Under these circumstances, Pickens' limited conduct in detaining Leija was reasonable and was not a constitutional violation of any kind.

Plaintiff is apparently contending in this lawsuit that Officer Pickens should have disregarded the serious concerns of the medical personnel and simply stood aside while Leija created a serious risk of harm to himself. But the law is otherwise, and for good reason. Where a patient is in a serious medical condition in need of critical treatment according to doctors, and where the patient shows unmistakable signs of irrational thinking and mental unsoundness and is about to place himself in danger, the Constitution does not require officers to stand idly by and do nothing besides verbalize commands to the patient. *See* Okla. Stat. tit. 43A, § 5-207; *Meyer*, 482 F.3d at 1239.

The situation currently before this Court is not the type presented in cases such as *Cruzan v. Director, MDH*, where the issue is whether a *competent* person's wishes to refuse medical treatment must be honored by the state. *Cruzan v. Director, MDH*, 497 U.S. 261 (1990). There is, in fact, no evidence that Leija was competent on the evening of March 24, 2011; to the contrary, the evidence overwhelmingly shows that Leija was not of sound mind and could not make informed decisions.

If Officer Pickens had done what Plaintiff now claims he should have, he would have been violating a clear and well established statutory directive. He would have acted contrary to

13

the requests of the medical personnel, and allowed a clearly delusional man to place himself in significant risk of harm and possibly death. What Pickens did was not a constitutional violation, as a matter of law.

### 2. Officer Pickens is Entitled to Qualified Immunity

Furthermore, and independent of the fact that no constitutional violation occurred, Officer Pickens is entitled to summary judgment under the doctrine of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

"When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right" and that the constitutional right allegedly violated was clearly established. *Cortez v. McCauley*, 478 F. 3d 1108, 1114 (10th Cir. 2007) (*en banc*). If the Court first finds that, based on the plaintiff's own allegations, the alleged constitutional violation was not clearly established, then the Court must dismiss the claim as a matter of law without taking the time to consider whether there was in fact a constitutional violation. *Pearson v. Callahan*, 129 S.Ct. 808, 818-19 (2009).

The Supreme Court has emphasized "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct

14

was unlawful in the situation he confronted. *See Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)) ('As [the Supreme Court] explained in Anderson, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established')." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The Plaintiff has the burden of convincing the court that the law was clearly established and that the reasonable official would understand that what he was doing violates a person's rights. *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988). "The complaint should include 'all of the factual allegations necessary to sustain a conclusion that defendant violated clearly established law.'" *Id.* (quoting *Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir. 1987)).

In this case, the law was not, and is not, clearly established that what Pickens did constituted a violation of the constitution. To the contrary, the constitutional jurisprudence on this topic provides that when an officer has probable cause to believe that a person is mentally impaired and is placing themselves or others in danger, the officer may detain that person for mental evaluation or medical care. *E.g., Pino v. Higgs*, 75 F.3d 1461, 1468 (10th Cir. 1996). That is exactly what occurred here with respect to Officer Pickens. As a matter of law, reasonable officers could objectively determine there was probable cause to detain Leija to protect him from danger. Defendants submit that nowhere in the Fourteenth Amendment jurisprudence is there a clearly established rule barring an Emergency Detention where the officer is informed by doctors that subduing a mentally unsound patient is necessary for the patient's health and where other attempts at subduing the patient, including a third party's use of a taser, failed. Moreover, as a matter of law, a reasonable officer could conclude that detaining Leija was constitutional because valid law in Oklahoma directs officers to detain individuals who are mentally impaired and

15

posing a danger to themselves. Okla. Stat. tit. 43A, § 5-207. This entitles Pickens to the protection of qualified immunity as a matter of law. For these reasons, summary judgment in favor of Pickens is required under the doctrine of qualified immunity. *Saucier*, 533 U.S. at 202.

## C.     PLAINTIFF'S TORT CLAIM FAILS AS A MATTER OF LAW

The City of Madill has immunity as to Plaintiff's state tort claim, pursuant to OKLA. STAT. tit. 51, § 155(6).  This statute provides that "[t]he state or a political subdivision shall not be liable if a loss or claim results from . . . the failure to provide, or the method of providing, police, law enforcement or fire protection."  § 155(6).  As the Oklahoma Supreme Court has held, the key word in this provision is "protection." *Morales v. City of Oklahoma City*, 230 P.3d 869, 876 (Okla. 2010). While cities in Oklahoma may be liable for negligence of its officers committed during law enforcement activities such as fighting crime or arresting suspected criminals, the city is not liable where the officer is attempting to protect an individual from harm, including harm to himself. *Id.*; *Schmidt v. Grady County*, 943 P.2d 595, 597-98 (Okla. 1997). For example, in *Schmidt*, the plaintiff was posing a danger to herself, thus the officer forced her into custody. *Schmidt*, 943 P.2d at 597-98.  He then put her into his patrol vehicle, but failed to restrain her with handcuffs or a seatbelt. *Id.* As a result, the plaintiff either fell or jumped from the vehicle and suffered injury. *Id.* The Court held that the officers conduct of taking custody of the individual for the purpose of protecting her from harm, fell under § 155(6) and that the political subdivision was therefore immune from liability for such conduct. *Id.*

In this case, the evidence plainly shows that Officer Pickens was attempting to protect Mr. Leija from causing serious harm to himself.  There is no dispute that Pickens was attempting to protect Leija's health.  Plaintiff's allegations involve the methods Officer Pickens used in providing a protective service for Leija's own health. Thus, the minimal conduct complained

of—detaining Leija by his arm and helping to bring him to the ground—falls squarely within § 155(6), as it has been interpreted by the Oklahoma Supreme Court. The State of Oklahoma has decided that a political subdivision, like the City of Madill, must be immune for such protective conduct. *See id.*

## V. <u>CONCLUSION</u>

WHEREFORE, Defendants respectfully request that the Court grant summary judgment in favor of Officer Pickens and the City of Madill. The undisputed evidence shows that Leija was mentally impaired. It shows that Pickens did what was necessary to protect Leija from a serious risk of harm. The hospital staff knew Leija needed to be restrained, but they did not feel they could do so. Despite Leija's strong resistance, despite the potentially harmful blood coming from his arms, someone needed to restrain him. Leija's safety was dependent on Pickens trying to stop him, and the indisputable record clearly shows Pickens did what was necessary to do so, and no more.

STEIDLEY & NEAL, P.L.L.C.

*Attorneys for Defendants*
*The City of Madill, Brandon Pickens and*
*James Fullingim*


By:     s/ Clark W. Crapster
        Eric D. Janzen, OBA #13826
        edj@steidley-neal.com
        Clark W. Crapster, OBA #22112
        cwc@steidley-neal.com
        CityPlex Towers, 53rd Floor
        2448 E. 81st Street
        Tulsa, Oklahoma 74137
        918/664-4612 (telephone)
        918/664-4133 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 19, 2012, I electronically transmitted the attached document to the Clerk of Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Jeremy Beaver
Warren Gotcher
GOTCHER AND BEAVER
jeremy@gotcher-beaver.com
Warren@gotcher-beaver.com

Philip W. Anderson
COLLINS, ZORN & WAGNER, P.C.
Panderson@czwglaw.com

s/ Clark W. Crapster
Of Steidley & Neal, P.L.L.C

18