# EXHIBIT #1

Brandon Pickens Deposition

Pages 16-29

Page 31

Case No  CV-085-FHS

6:12-cv-00085-JHP   Document 64-1   Filed in ED/OK on 01/14/13   Page 2 of 16

Brandon Pickens                                    Aldaba vs. Marshall County
December 12, 2012                                       Case No. CJ-11-81

Page 16

1          At that point did you know anything at
2   all about the patient or the problem?
3        A    Not until I began speaking with him.
4        Q    Who else did you see standing around?
5        A    I believe there was another male nurse,
6   and then another female nurse or doctor.  I'm not
7   for sure.
8        Q    And this was outside of one of the
9   hospital rooms?
10       A    Yes.
11       Q    Were there any other law enforcement
12  officers there?
13       A    Not at that time, no.
14       Q    Who's the first person you came to that
15  you talked to or got information from?
16       A    As I walked up I immediately started
17  talking to the doctor, Dr. Conley.
18       Q    Where was the patient?
19       A    In the -- in the room; I believe Room
20  104.
21       Q    So at this point you had not seen the
22  patient?
23       A    No, sir.
24       Q    Tell me what Dr. Conley tells you.
25       A    He told me the name, that Mr. Leija

6:12-cv-00085-JHP   Document 64-1   Filed in ED/OK on 01/14/13   Page 3 of 16

Brandon Pickens                               Aldaba vs. Marshall County
December 12, 2012                             Case No. CJ-11-81

Page 17

1  was -- was in the room. He was undergoing
2  treatment. He -- he appeared to be on some type
3  of drug. He --
4      Q    That's what he told you?
5      A    Yes.
6           That there was a nurse that had left
7  for restraints. I remember -- I remember him
8  talking about him needing to be restrained. And
9  Dr. Conley told me the man could not leave the
10 hospital or he would die.
11          And I only talked to him just a few --
12 90 seconds at the most, and the door opened.
13     Q    He told you that if he left the
14 hospital he would die?
15     A    Yes, sir.
16     Q    Are those -- I mean, how accurate do
17 you think you are in remembering his exact words?
18     A    100 percent.
19     Q    Do you feel that's precisely what he
20 told you?
21     A    Yes, sir.
22     Q    Did you ask him what the condition was
23 of the patient?
24     A    I -- I didn't -- I didn't make it that
25 far. The door opened prior to much information.

6:12-cv-00085-JHP   Document 64-1   Filed in ED/OK on 01/14/13   Page 4 of 16

Brandon Pickens                             Aldaba vs. Marshall County
December 12, 2012                              Case No. CJ-11-81

Page 18

1    Q    Say that again?
2    A    The door opened to the room prior to
3    very much information. We didn't speak very
4    long.
5    Q    When the door opened, what happened?
6    A    Mr. Leija came out of the room and went
7    south. He didn't acknowledge me or anyone else.
8    He just proceeded to walk to leave the hospital.
9    Q    South. And was that away from you?
10   A    Yes, sir.
11   Q    Where were you standing when he walked
12   out of the room?
13   A    Just a few feet from the door.
14   Q    Have you seen the video from the
15   hospital?
16   A    Yes.
17   Q    When Mr. Leija walked out of the room
18   did he say anything as he walked past you?
19   A    No, sir.
20   Q    Did you say anything to him?
21   A    No, sir.
22   Q    What's the next thing that happened?
23   A    I cut -- basically, cut him off in the
24   hallway.
25   Q    Why did you do that?

Brandon Pickens                                  Aldaba vs. Marshall County
December 12, 2012                                       Case No. CJ-11-81

```
                                                            Page 19
 1       A    Because the doctor said that he didn't
 2   need to leave or he would die.
 3       Q    Had Mr. Leija committed any crimes at
 4   that point?
 5       A    No, sir.
 6       Q    Did you have any reason to think that
 7   he had committed any crimes at that point?
 8       A    I had reason to believe that he could
 9   have tore things up in the hospital.  I believed
10   I was dealing with a mental patient.
11       Q    Now, you had -- okay.
12            I want to make sure that I'm clear
13   about everything you can remember that Dr. Conley
14   told you in that 90 seconds.
15            He said -- he told you that he was sick
16   and that he would die if he left the hospital.
17   Then he told you that he possibly was on -- acted
18   as if he was on some sort of drugs.  Is that
19   right?
20       A    Yes.
21       Q    And what else did he tell you?
22       A    That's basically all I remember.
23       Q    And when he walked out of the room he
24   didn't say anything to you; the patient?
25       A    No, sir.
```

Word for Word Reporting, LLC
405-232-9673 (OKC) 918-583-9673 (Tulsa) 918-426-1122 (McAlester)

6:12-cv-00085-JHP   Document 64-1   Filed in ED/OK on 01/14/13   Page 6 of 16

Brandon Pickens                          Aldaba vs. Marshall County
December 12, 2012                        Case No. CJ-11-81

Page 20

1    Q    He didn't say anything to anybody, did
2    he?
3    A    No, sir.
4    Q    Between the time that you went to stop
5    him, what did he do, besides walk away?
6    A    That's it.
7    Q    And whenever you -- you said you walked
8    around him an you cut him off. He did stop at
9    that point. Is that right?
10   A    Yes.
11   Q    What did you say to him? What's the
12   first thing that you said to him?
13   A    I don't remember the very first thing I
14   said to him.
15   Q    Something along the lines of stop?
16   A    Yeah. Yes, sir.
17   Q    And he followed that order?
18   A    Yes.
19   Q    What's the next thing that you remember
20   him saying or you saying, whatever happened next?
21   A    He said that they were trying to kill
22   him, as far as hospital staff. I told him we
23   needed to go back to his room and we would talk.
24   He said he wanted his wife. He said he wanted to
25   leave the hospital several times. I told him

6:12-cv-00085-JHP   Document 64-1   Filed in ED/OK on 01/14/13   Page 7 of 16

Brandon Pickens                                    Aldaba vs. Marshall County
December 12, 2012                                       Case No. CJ-11-81

Page 21

1   that we could go back to the room. He could
2   speak with his wife there. I told him I would
3   personally find his wife if he would go back to
4   his room.
5       Q   Why didn't you let him leave when he
6   said he wanted to leave?
7       A   Because at that point in time the
8   doctor told me that he did not need to leave. I
9   was concerned for his -- for his health, and I
10  didn't want him walking out of the hospital and
11  dying.
12      Q   What authority did you feel like, as a
13  police officer, you had to stop him at that
14  particular moment?
15      A   It was my job to save his life. I did
16  the best I knew how.
17      Q   So, in your mind, he didn't have the
18  right to leave the hospital if his health was in
19  danger?
20      A   No, sir.
21      Q   Other than what Dr. Conley told you,
22  did you have anything else that you were basing
23  that determination on?
24      A   His look.
25      Q   As he walked away from you?

6:12-cv-00085-JHP   Document 64-1   Filed in ED/OK on 01/14/13   Page 8 of 16

Brandon Pickens                              Aldaba vs. Marshall County
December 12, 2012                               Case No. CJ-11-81

Page 22

1   A   When I first -- when I cut him off,
2   when I faced him and he faced me, the look that
3   he had.
4   Q   What was that?
5   A   I call it a thousand-yard stare. It
6   was like he was looking at me, but he looked
7   right through me, if that makes sense.
8   Q   What else, besides the way he looked?
9   A   That's it.
10  Q   Okay. So you told him that he needed
11  to go back to his room, that you would try to
12  find his wife. What happened next?
13  A   During, I believe, that time was about
14  the time the deputies showed up. He proceeded
15  again down the hallway. I -- I believe I stopped
16  him again.
17      He pulled the -- I don't believe there
18  were actually needles. I believe it was gauze
19  with tape over it. He pulled that out.
20  Q   Let me stop you there.
21      The second time that you said you
22  stopped him, at that point had he committed any
23  crimes in your presence?
24  A   No, sir.
25  Q   Had you been told that he'd committed

6:12-cv-00085-JHP   Document 64-1   Filed in ED/OK on 01/14/13   Page 9 of 16

Brandon Pickens                      Aldaba vs. Marshall County
December 12, 2012                    Case No. CJ-11-81

Page 23

1  any crimes?
2       A    No, sir.
3       Q    What was the basis for stopping him the
4  second time?
5       A    He -- his health.
6       Q    You believed it was --
7       A    Which, he -- he was -- he was told to
8  stop, and then proceeded again.
9       Q    Now, do you believe as a law
10 enforcement officer you can stop -- you have the
11 right to stop people if they've not committed
12 crimes that you've seen?
13      A    I believe I have the right to know
14 what's going on when I'm called.
15      Q    And that includes to stop people from
16 leaving that haven't committed any crimes in your
17 presence?
18      A    For investigative purposes, yes.
19      Q    What crime were you investigating?
20      A    I wasn't investigating a crime at that
21 point.
22      Q    Did he have any weapons on him?
23      A    No, sir.
24      Q    Had you been told that he had any
25 weapons?

6:12-cv-00085-JHP   Document 64-1   Filed in ED/OK on 01/14/13   Page 10 of 16

Brandon Pickens                           Aldaba vs. Marshall County
December 12, 2012                              Case No. CJ-11-81

Page 24

1   A   No, sir.
2   Q   Could you see both of his hands clearly
3   to know that he didn't have any weapons in his
4   hands?
5   A   Yes.
6   Q   Was he wearing a hospital gown?
7   A   Yes.
8   Q   Was there any pockets on the hospital
9   gown in which a weapon could have been?
10  A   I don't know.
11  Q   Did you have any concerns at all that
12  he had a weapon?
13  A   Not at that time, no.
14  Q   Okay.  Did you have a warrant for his
15  arrest?
16  A   No.
17  Q   Did you have -- had you talked to a
18  judge or gotten any sort of authority from a
19  judge to stop him?
20  A   No.
21  Q   What happened next?
22      Now, in the line of things, you've
23  stopped him for the second time.  Let's just pick
24  up there.
25      You stopped him a second time, and what

Brandon Pickens                              Aldaba vs. Marshall County
December 12, 2012                            Case No. CJ-11-81

Page 25

1   happened from that point forward?
2       A   He -- he became angry, very angry; not
3   that he wasn't angry before.
4       Q   So he was angry before?
5       A   Yes.
6       Q   Okay.  When was he angry before?
7       A   Apparently, before I was called.
8       Q   You didn't ever see him angry before
9   the second time that you stopped him, though, did
10  you?
11      A   He -- he was angry --
12              MR. ANDERSON:  Object to the
13  form of the question.
14              THE WITNESS:  -- when I got
15  there.
16  BY MR. BEAVER:
17      Q   Well, I asked you earlier what you knew
18  about the situation, and you told me that there
19  was a patient who was unruly, correct?
20      A   Yes.
21      Q   You didn't tell me that the patient was
22  angry or you were told the patient was angry, did
23  you?
24      A   No, sir.
25      Q   You weren't told that the patient was

6:12-cv-00085-JHP   Document 64-1   Filed in ED/OK on 01/14/13   Page 12 of 16

Brandon Pickens                                    Aldaba vs. Marshall County
December 12, 2012                                       Case No. CJ-11-81

Page 26

1  angry, were you?
2                    MR. McKELVEY:  Object to the
3  form.
4  BY MR. BEAVER:
5      Q   Okay.  Were you ever told the patient
6  was angry before you got to the hospital?
7      A   I would think they would coincide.
8      Q   Unruly and angry?
9      A   Yes.
10     Q   So it's an assumption that you had, not
11 based on something that you were told?
12                   MR. McKELVEY:  Object to the
13 form.
14                   MR. ANDERSON:  Same
15 objection.
16 BY MR. BEAVER:
17     Q   Did you make the assumption that he was
18 angry?
19                   MR. McKELVEY:  Object to the
20 form.
21                   THE WITNESS:  Yes.
22 BY MR. BEAVER:
23     Q   Okay.  You stopped him a second time.
24 He appeared angry.  And what happened?
25     A   He took the -- the gauze and tape off

6:12-cv-00085-JHP   Document 64-1   Filed in ED/OK on 01/14/13   Page 13 of 16

Brandon Pickens                                    Aldaba vs. Marshall County
December 12, 2012                                      Case No. CJ-11-81

Page 27

1  and began bleeding everywhere.  Raised his hands
2  and began yelling, this is my blood.  I took that
3  as a -- he was going to use his blood as a
4  weapon.
5          I didn't know what he had, if it was
6  something I could get, so I stepped away from
7  him.
8     Q    He took the gauze off of where?
9     A    His forearm area.
10    Q    Which arm?
11    A    Both.  I believe there were three; two
12 on his one arm and one on the other.
13    Q    You said he was bleeding everywhere.
14 Now, that's a big word.  I want to be clear about
15 what you mean by "everywhere".
16         Was his arm soaked in blood?  Were his
17 clothes soaked in blood?  Describe the blood.
18    A    There was a lot of blood, but he wasn't
19 saturated in blood; a fairly steady stream of
20 blood out of each arm.
21    Q    Okay.  Were the other officers, Deputy
22 Beebe and Atnip, there when he raised his hands
23 over his head?
24    A    Yes.
25    Q    And you haven't left out anything, as

Brandon Pickens                          Aldaba vs. Marshall County
December 12, 2012                             Case No. CJ-11-81

Page 28

1  far as any statements that he made or that you
2  made to him?  You've told me everything that
3  happened up until the time that he raised his
4  hands above his head and said, this is my blood?
5      A    As far as I know, yes.
6      Q    Okay.  And you took that as a -- how
7  did you take that?  I don't want to put words in
8  your mouth.
9      A    That was aggressive.  I believe that
10 was very aggressive.
11     Q    Why?  Why was that aggressive?
12     A    I believe that his blood could be used
13 as a weapon.
14     Q    Do you believe that that's what he was
15 threatening to do to you at that time?
16     A    Yes.
17     Q    Based on what?
18     A    I wouldn't think that was normal
19 behavior.  He was told several times to calm
20 down, go back to his room.
21     Q    Who told him to calm down?
22     A    I did.
23     Q    Okay.  And after he said, this is my
24 blood, what happened next?
25     A    Deputy Atnip told Deputy Beebe to tase

6:12-cv-00085-JHP   Document 64-1   Filed in ED/OK on 01/14/13   Page 15 of 16

Brandon Pickens                          Aldaba vs. Marshall County
December 12, 2012                        Case No. CJ-11-81

Page 29

1  him.  Deputy Beebe went along with his, whatever
2  procedure, steps they have to go on prior to the
3  taser being fired.  I don't remember those steps.
4         I don't have any training with a taser,
5  so I really can't tell you.
6     Q   Just tell me what you saw and what you
7  heard.
8     A   I believe Deputy Atnip had told Deputy
9  Beebe twice to tase him.
10    Q   Okay.  What happened next?
11    A   Deputy Beebe tased the man.
12    Q   Where at?
13    A   One of the prongs, I believe, hit him
14 in the stomach.  The other one didn't make a
15 connection.
16        He screamed not to do that; don't do
17 that again, and -- and turned and walked away,
18 still bleeding.
19    Q   What happened next?
20    A   He had made -- made it near the
21 cafeteria door to the hospital.  I took his left
22 arm -- we -- I placed hands on him, took his left
23 arm, attempted an arm bar; unsuccessful.  Deputy
24 Atnip was there as well, along with Beebe.  They
25 were helping -- helping me take him to the

Brandon Pickens                             Aldaba vs. Marshall County
December 12, 2012                           Case No. CJ-11-81

Page 31

1   objection.
2   BY MR. BEAVER:
3       Q    Go ahead and answer.
4       A    The plan wasn't -- wasn't to hurt him
5   any worse than -- than whatever medical condition
6   he had.
7       Q    Did you ever consider what effect him
8   being shot with a taser and then subsequently
9   wrestled to the ground against his will would
10  have on his health?
11      A    Can you repeat that again?
12      Q    Did you ever consider what effect the
13  shot with a taser and then wrestled to the ground
14  against his will by the three of you would have
15  on his health?
16      A    No.
17      Q    Is that a thought that you had before
18  all of this happened?
19      A    I wasn't trying to hurt him any worse,
20  but, no.
21      Q    You didn't consider that?
22      A    No.
23      Q    Okay.  What happened next?
24      A    We -- we got him on the ground, began
25  to handcuff him.  He vomited.  I was on his left